**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FIRST TRUST PORTFOLIOS L.P.<br>    an Illinois limited partnership,<br><br>        Plaintiff,<br><br>v.<br><br>JACKSON NATIONAL LIFE INSURANCE<br>COMPANY,<br>    a Michigan company,<br>JACKSON NATIONAL LIFE INSURANCE<br>COMPANY OF NEW YORK,<br>    a New York company,<br>JACKSON NATIONAL LIFE DISTRIBUTORS,<br>LLC,<br>    a Delaware limited liability company,<br>JNL VARIABLE FUND, LLC,<br>    a Delaware limited liability company,<br>JACKSON NATIONAL ASSET MANAGEMENT,<br>LLC,<br>    a Michigan limited liability company,<br>JNL INVESTORS SERIES TRUST,<br>    a Massachusetts business trust, and<br>MELLON CAPITAL MANAGEMENT<br>CORPORATION,<br>    a Delaware corporation,<br><br>        Defendants. | `FILED STAMP: AUG. 25, 2008`<br>`08CV4853`<br>`JUDGE GUZMAN`<br>`MAG. JUDGE SCHENKIER`<br>`J. N.`<br><br>Civil Action No. _____<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, First Trust Portfolios L.P. ("First Trust"), for its complaint against Defendants,

Jackson National Life Insurance Company ("JNL"), Jackson National Life Insurance Company

of New York ("JNLNY"), Jackson National Life Distributors, LLC ("JNLD"), JNL Variable

Fund, LLC ("JNL Variable Fund"), Jackson National Asset Management, LLC ("JNAM" or the

"Advisor"), JNL Investors Series Trust ("JNL Trust") (collectively "JNL Defendants") and

Mellon Capital Management Corporation ("Mellon Capital" or the "Sub-Adviser"), alleges as follows:

## THE PARTIES

1.      First Trust Portfolios L.P. is a limited partnership organized and existing under the laws of the state of Illinois, with its principal place of business at 1001 Warrenville Road, Lisle, IL 60532.  First Trust Portfolios L.P. is the largest independent unit investment trust sponsor in North America.

2.      On information and belief, JNL is a stock life insurance company organized and existing under the laws of the state of Michigan, with its principal place of business at 1 Corporate Way, Lansing, Michigan 49851, and is wholly owned by Prudential plc, a publicly traded life insurance company in the United Kingdom.  Further, on information and belief, JNL is authorized to conduct life insurance and annuity business in all states except New York.

3.      On information and belief, JNLNY has its principal place of business and home office in Purchase, New York.  JNLNY issues variable annuities and life insurance products, which are distributed by Jackson Nation Life Distributors, LLC.  JNLNY is a subsidiary of JNL and an indirect subsidiary of Prudential plc, a company incorporated and with its principal place of business in the United Kingdom.

4.      JNL Variable Fund is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business at 1 Corporate Way, Lansing, MI 48951.

5.      On information and belief, JNL Variable Fund also conducts business from offices located at 225 West Wacker Drive, Chicago, Illinois 60606.

6.      JNL Variable Fund offers interests in separate funds, which are comprised of two groups – Disregarded Entity Funds and Regulated Investment Company Funds.

7.      The interests of the JNL Variable Fund are sold to life insurance company separate accounts to fund the benefits of variable insurance contracts and to regulated investment companies.

8.      JNL Variable Fund currently offers interests in a number of separate funds, including but not limited to the JNL/Mellon Capital Management VIP Fund.

9.      The management of the business and affairs of the JNL Variable Fund is the responsibility of the Board of Managers of the JNL Variable Fund.

10.      JNAM is a limited liability company organized and existing under the laws of the state of Michigan with its principal place of business in Chicago, Illinois.  JNAM is a wholly owned subsidiary of JNL.

11.      JNAM is the investment Adviser to the JNL Variable Fund and provides the JNL Variable Fund with professional investment supervision and management.

12.      On information and belief, Mellon Capital is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 50 Fremont, Suite 3900, San Francisco, CA 94105.  On information and belief, Mellon Capital is a wholly owned subsidiary of the Bank of New York Mellon Corporation, a publicly traded financial holding company.

13.      As the Adviser, JNAM has selected Mellon Capital as Sub-Adviser to manage the investment and reinvestment of the assets of the Funds associated with the interests of JNL Variable Fund currently being offered and sold.

14.     JNAM, the Adviser, monitors the compliance of Mellon Capital, the Sub-Adviser, with the investment objectives and related policies of each Fund and reviews the performance of Mellon Capital and reports periodically on such performance to the Board of Managers of the JNL Variable Fund.

15.     As compensation for its services, JNAM receives a fee from the JNL Variable Fund computed separately for each Fund associated with the interests of JNL Variable Fund currently being offered and sold.  The fee for each Fund is stated as an annual percentage of the net assets of the Fund.  The fee, which is accrued daily and payable monthly, is calculated as the basis of the net assets of each Fund.

16.     Under the terms of the Sub-Advisory Agreement between Mellon Capital and JNAM (the Adviser), Mellon Capital manages the investment and reinvestment of the assets of each Fund, subject to the oversight and supervision of JNAM and the Board of Managers of the JNL Variable Fund.

17.     Mellon Capital formulates a continuous investment program for each Fund associated with the interests of the JNL Variable Fund currently being offered and sold, consistent with the Fund's investment objectives and policies outlined in the applicable Prospectus.  Mellon Capital implements such programs by purchases and sales of securities and regularly reports to JNAM and the Board of Managers of the JNL Variable Fund with respect to the implementation of such programs.

18.     The individuals primarily responsible for the day-to-day management of JNL Variable Fund's portfolio are Susan Ellison, Richard A. Brown, and Karen Q. Wong, all of whom are believed to be employees of Mellon Capital.

19.     As compensation for its services, Mellon Capital receives a fee from JNAM computed separately for each Fund associated with the interests of the JNL Variable Fund currently being offered and sold.  This fee is stated as an annual percentage of the net assets of each Fund.  JNAM is currently obligated to pay Mellon Capital out of the advisory fee it receives from each Fund.

20.     JNAM provides oversight and evaluation services to the JNL/Mellon Capital Management VIP Fund, including but not limited to performing initial due diligence on prospective Sub-Advisers for the Fund; monitoring the performance of Sub-Advisers; communicating performance expectations to the Sub-Advisers, and ultimately recommending to the Board of Managers of the JNL Variable Fund whether a Sub-Adviser's contract should be renewed, modified, or terminated.

21.     In addition to the investment advisory fee, JNL/Mellon Capital Management VIP Fund pays JNAM an administrative fee of 0.15% of the average daily net assets of the Fund.

22.     Interests in the JNL/Mellon Capital Management VIP Fund have been and are currently sold to regulated investment companies and to separate accounts of JNL and JNLNY to fund the benefits under certain variable annuity and variable life contracts.

23.     JNL and JNLNY have purchased and continue to purchase interests in the JNL/Mellon Capital Management VIP Fund at net asset value using premiums received on variable annuity and/or variable life contracts issued by JNL or JNLNY.  JNL and JNLNY use the interests in JNL/Mellon Capital Management VIP Fund to fund the benefits under certain variable annuity and variable life contracts.  Interests in the JNL/Mellon Capital Management VIP Fund are not available to the general public directly.

24. On information and belief, JNL Investors Series Trust ("JNL Trust") is an open-end management investment company organized under the laws of the Commonwealth of Massachusetts, by a Declaration of Trust dated July 28, 2000. On information and belief, JNL Trust has a principal place of business at 85 State Street, Boston, MA 02109. On information and belief, JNL Trust has offered and currently offers A and C Class shares of separate series of Funds, including but not limited to the Jackson Perspective VIP Fund. The JNL Trust is registered with the United States Securities and Exchange Commission ("SEC") as an investment company under the Investment Company Act of 1940, as amended, whose shares are registered with the SEC under the Securities Act of 1933, as amended.

25. JNL Trust currently offers shares in Funds that are a series of separate mutual fund portfolios within a single trust, each with a specific investment objective. Jackson Perspective VIP Fund is one such Fund. There are 19 portfolios within the JNL Trust.

26. Officers of the JNL Trust manage its day-to-day operations and are responsible to the Trust's Board of Trustees. The Trustees set broad policies for each Fund and choose the Trust's officers.

27. JNAM is the investment Adviser to JNL Trust, pursuant to an Investment Advisory and Management Agreement. JNAM provides the JNL Trust with professional investment supervision and management.

28. Mellon Capital serves as Sub-Adviser to Jackson Perspective VIP Fund and conducts day-to-day management. Pursuant to Mellon Capital's Sub-Advisory Agreement with JNAM, Mellon Capital makes investment decisions for the Jackson Perspective VIP Fund, including determinations as to the purchase and sale of securities for the Fund and the disposition of assets for the Fund.

29. Richard Brown and Karen Wong have been and are portfolio managers for the Jackson Perspective VIP Fund. Both are believed to be employees of Mellon Capital.

30. As compensation for its services, Mellon Capital receives fees from JNAM computed separately for the Jackson Perspective VIP Fund. The Sub-Adviser's fee for the Jackson Perspective VIP Fund is stated as an annual percentage of the net assets of the Fund, and is calculated based on the average net assets of the Fund. The management fee JNAM currently is obligated to pay Mellon Capital out of the advisory fees that JNAM receives from the Jackson Perspective VIP Fund ranges from 0.12% to 0.015%.

31. Jackson National Life Distributors LLC ("JNLD"), 7601 Technology Way, Denver, Colorado 80237, is the distributor of the shares of the Jackson Perspective VIP Fund, which are offered for sale on a continuous basis. JNLD is a wholly owned subsidiary of JNL. JNLD currently serves as distributor for other investment companies advised by JNAM and for variable contracts issued by JNL and JNLNY.

32. JNAM monitors and reviews the performance of Mellon Capital and the Jackson Perspective VIP Fund. In providing this oversight function, JNAM regularly reports to the Jackson Perspective VIP Fund Board related to Mellon Capital's management, trading and compliance functions. JNAM does not make individual investment decisions on behalf of the Jackson Perspective VIP Fund. JNAM does not have a portfolio management department and does not operate a trading desk. JNAM provides the Jackson Perspective VIP Fund with various services, including but not limited to compliance, fund accounting, transfer agency services, due diligence, and administrative services.

33. On information and belief, the Jackson Perspective VIP Fund underlies certain variable products sponsored by JNL and/or JNLNY, and is primarily sold to the separate accounts of these variable products.

34. On information and belief, JNL sells shares in the Jackson Perspective VIP Fund to the public as a retail mutual fund.

35. On information and belief, JNLNY sells shares in the Jackson Perspective VIP Fund to the public as a retail mutual fund.

## JURISDICTION AND VENUE

36. This action arises under the Patent Laws of the United States (35 U.S.C. §§ 1 *et seq.*) and seeks damages and injunctive relief as provided in 35 U.S.C. §§ 281 and 283-285.

37. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

38. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## BACKGROUND

39. In 1998, representatives of the JNL Defendants and First Trust commenced a dialogue about implementing into Jackson National Life Insurance Company's variable annuity products certain investment strategies used by First Trust Portfolios L.P in its unit investment trusts.

40. As a result of this dialogue, First Trust facilitated the implementation of five successful investment strategies in the variable annuity products of Jackson National Life

Insurance. First Trust worked with JNL Variable Fund to implement variable annuity funds using these five investment strategies.

41.     As Sub-Advisor to JNL Variable Fund, First Trust managed the investment and reinvestment of the assets of each of JNL Variable Fund's variable annuity funds.

42.     In December 2003, JNL Variable Fund and JNAM terminated their relationship with First Trust. In First Trust's place, JNL Variable Fund and JNAM retained the firm of Curian Capital, LLC. The sub-advisory relationship between JNL Variable Fund, JNAM, and Curian Capital, LLC lasted approximately two months.

43.     Subsequently, JNL Variable Fund and JNAM solicited requests for proposals from numerous investment firms, including First Trust and Mellon Capital. Ultimately, Mellon Capital was selected as the new Sub-Advisor for JNL Variable Fund.

44.     First Trust developed other innovative investment strategies, not provided to JNL Variable Fund or JNAM for use in variable annuity products, including a method of selecting a portfolio of securities using buyback ratio and dividend yield.

45.     Without authorization from First Trust, JNL Variable Fund copied First Trust's security selection method for use in JNL Variable Fund's JNL/Mellon Capital Management VIP Fund. Further, the JNL Trust copied the method for use in the JNL Investors Series' Jackson Perspective VIP Fund.

## INFRINGEMENT OF U.S. PATENT NO. 6,920,432

46.     First Trust incorporates paragraphs 1 through 45 as if fully set forth herein.

47.     On July 19, 2005, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,920,432 ("the '432 patent") titled "Techniques of Selecting Securities For A Portfolio Using Buyback Ratio and Dividend Yield." A true and correct copy of the '432

patent is attached as Exhibit A to this Complaint. Through assignment to Nike Securities, and a later name change, First Trust Portfolios L.P. acquired and continues to maintain all rights, title, and interest in and to the '432 patent, including the right to sue and collect damages for past infringement.

48. The investment objective of the JNL/Mellon Capital Management VIP Fund and the Jackson Perspective VIP Fund ("the VIP Funds") is total return. The VIP Funds seek to achieve that objective by investing in the common stocks of companies that are identified by a model based on six separate specialized strategies. One of those six strategies is the Dow Core 5 Strategy ("DC5 Strategy").

49. The DC5 Strategy seeks to achieve its objective by investing in a portfolio of DJIA stocks with high dividend yields and/or high buyback ratios and high return on assets. By analyzing dividend yields, the DC5 Strategy seeks to uncover stocks that may be out of favor or undervalued. The securities for the DC5 Strategy are selected only once annually on each Stock Selection Date set for the VIP Funds. The Stock Selection Date for the JNL/Mellon Capital Management VIP Fund is on or about January 1 of each year. The initial Stock Selection Date for the Jackson Perspective VIP Fund was on or about January 1, 2008. The next Stock Selection Date for the Jackson Perspective VIP Fund is expected to be on or about March 1, 2009. Thereafter, the Stock Selection Date for the Jackson Perspective VIP Fund will be 13 months after the prior Stock Selection Date. Buyback ratio is the ratio of a company's shares of common stock outstanding 12 months prior to each Stock Selection Date divided by a company's shares outstanding on each Stock Selection Date, minus "1."

50.     On each Stock Selection Date applicable to the VIP Funds occurring after July 19, 2005, Mellon Capital has selected securities for the VIP Funds in accordance with the DC5 Strategy by carrying out at least the following process steps:

Step 1 – Mellon Capital ranked all 30 stocks contained in the DJIA by the sum of their dividend yield and buyback ratio;

Step 2 – Mellon Capital selected the 10 stocks with the highest sum of dividend yield and buyback ratio; and

Step 3 – From the 10 stocks selected above, Mellon Capital selected the five stocks with the greatest increase in return on assets in the most recent year as compared to the previous year.

51.     On information and belief, a reasonable opportunity for discovery will show that Mellon Capital and JNAM have infringed and continue to infringe one or more claims of the '432 patent in violation of 35 U.S.C. § 271(a).

52.     On information and belief, a reasonable opportunity for discovery will show that JNL Variable Fund, JNL Trust, JNLD, JNL, and JNLNY have each infringed and continue to infringe one or more claims of the '432 patent in violation of 35 U.S.C. § 271(g).

53.     On information and belief, the JNL Defendants and Mellon Capital are engaging in willful and deliberate infringement of the '432 patent which justifies an increase in damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

54.     First Trust has sustained substantial damages as a result of the JNL Defendants' and Mellon Capital's acts of infringement.

55. The JNL Defendants' and Mellon Capital's continued infringement of the '432 patent is causing and will continue to cause irreparable injury to First Trust unless the JNL Defendants' and Mellon Capital's infringement activities are enjoined by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, First Trust asks this Court to:

A. Enter judgment that the JNL Defendants and Mellon Capital have infringed the '432 patent;

B. Enter judgment that the JNL Defendants' and Mellon Capital's infringement has been willful;

C. Enter a permanent injunction prohibiting the JNL Defendants and Mellon Capital, their subsidiaries, divisions, agents, servants, employees, and those in privity with them from infringing the '432 patent and for all further proper injunctive relief;

D. Award First Trust damages against the JNL Defendants and Mellon Capital adequate to compensate First Trust for the infringement of the '432 patent;

E. Award First Trust its reasonable attorneys' fees in accordance with 35 U.S.C. § 285;

F. Award First Trust treble damages pursuant to 35 U.S.C. § 284;

G. Award First Trust interest and costs; and

H. Award First Trust such other relief as the Court may deem just and proper, including other relief permitted under the Patent Statute.

## JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, First Trust hereby demands a trial by jury on all issues so triable.

Dated: August 25, 2008                    /s/ Stephen F. Sherry
                                          Stephen F. Sherry
                                          Lawrence M. Jarvis
                                          Sara J. Bartos
                                          McANDREWS, HELD & MALLOY, LTD.
                                          500 West Madison Street, 34th Floor
                                          Chicago, Illinois 60661
                                          (312) 775-8000
                                          *Attorneys for First Trust Portfolios L.P.*

# EXHIBIT A



US006920432B1

(12) **United States Patent**  (10) **Patent No.:**  **US 6,920,432 B1**

Carey  (45) **Date of Patent:**  **Jul. 19, 2005**

(54) **TECHNIQUES OF SELECTING SECURITIES FOR A PORTFOLIO USING BUYBACK RATIO AND DIVIDEND YIELD**

(75) Inventor: **Robert Franklin Carey**, Naperville, IL (US)

(73) Assignee: **Nike Securities, L.P.**, Lisle, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 491 days.

(21) Appl. No.: **09/639,478**

(22) Filed: **Aug. 15, 2000**

(51) **Int. Cl.**[7] ............................................. **G06F 17/60**
(52) **U.S. Cl.** ........................................................ **705/36**
(58) **Field of Search** ......................................... 705/36

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,132,899 | A | * | 7/1992 | Fox | 705/36 |
| 5,335,277 | A | * | 8/1994 | Harvey et al. | 380/242 |
| 5,761,442 | A | * | 6/1998 | Barr et al. | 705/36 |
| 5,784,696 | A | * | 7/1998 | Melnikoff | 705/36 |
| 5,819,238 | A | * | 10/1998 | Fernholz | 705/36 |
| 5,884,287 | A | * | 3/1999 | Edesess | 705/36 |
| 5,930,774 | A | * | 7/1999 | Chennault | 705/36 |
| 5,978,778 | A | * | 11/1999 | O'Shaughnessy | 705/36 |
| 6,035,286 | A | * | 3/2000 | Fried | 705/36 |
| 6,161,099 | A | | 12/2000 | Harrington et al. | 705/37 |
| 6,839,685 | B1 | * | 1/2005 | Leistensnider et al. | 705/36 |
| 2003/0105672 | A1 | * | 6/2003 | Epstein et al. | 705/26 |

FOREIGN PATENT DOCUMENTS

WO        WO-00/33212 A1 *   6/2000

OTHER PUBLICATIONS

Dunagan, P., et al. "Investing for Dividend Growth," Black Enterprise, vol. 23, No. 10, pp. 37–42, May 1993.*
Hardy, E.S., "Get with Value," Forbes, vol. 155, No. 3, pp. 63–66, Jan. 30, 1995.*

Downes, J., Editor, Dictionary of Finance and Investment Terms, 5th Edition, Barron's Educational Series, Hauppage, New Yor 1998, pp. 452–454, and 550–551.*
Anon., "Polaris Securities Permitted to Trade in Japanese Stocks for Flients," Taiwan Economic News, Aug. 2, 1999.*
Longo, T., "Advisers vs. Brokers: What's in a Name?," On Wall Street, Sep. 1, 1999.*
Anon., "TD Waterhouse to Bring Net Broking to India vs. JV with Tata Securities," Economic Times, Dec. 14, 1999.*
Wadhwani, S.B., "The US Stock Market and the Global Economic Crisis," National Institute Economic Review, No. 167, pp. 86 105, Jan. 1999.*
Wiles, R., "Public Watches Dow, but Invests in S&P," Arizona Republic, Final Chaser edition, p. D1, Sunday, Mar. 21, 199.*
Gallagher, K., "Milwaukee Investing Club, down 42.4 Percent, Meets to Decide New Strategy," Knight–Ridder tribune Business News, May 8, 2000.*
Hoffman, D., "Market Conditions Are Indicating . . . the Best Oportunities Will Still Be in New Economy Areas," Investment News, vol. 4, No. 25, p. 50, Jun. 26, 2000.*
Liscio, J., "Splitting Shares: Using the Americus Trusts to Boost Blue–chip Returns," (Abstract only) Barron's, vol. 68, No. 11, p 13, 72–73, Mar. 14, 1988.*

(Continued)

*Primary Examiner*—Nicholas D. Rosen
(74) *Attorney, Agent, or Firm*—McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A technique is provided for selecting a portfolio of securities for investment purposes. Specifically, the technique utilizes two types of securities-related data: dividend yields and buyback ratios. A group of securities is ranked by the sum of each security's dividend yield and buyback ratio; a number of the securities having the highest combined dividend yields and buyback ratios are selected for investment. The technique may include a computer for storing the buyback ratios and dividend yields.

**18 Claims, 2 Drawing Sheets**



# US 6,920,432 B1

Page 2

## OTHER PUBLICATIONS

Anon., "PaineWebber Readies Unit Trust That Invests in Possible Takeover Targets," Securities Week, p. 9, Nov. 14, 1988.*

Roush, M., "FoM Joins New Investment Trust," Crain's Detroit Business, vol. 11, No. 11, p. 28, Mar. 13, 1995.*

Lunenberg, S., "The Best Stock–Picking Strategy Yet?" (Abstract only), Medical Economics, vol. 74, No. 4, pp. 46–61, Feb. 24, 1997.*

Brown, J., "Tax Changes May Dog 'Beating the Dow' Strategy," San Jose Mercury News, Wednesday, Morning Final Edition, p. 4G, Sep. 3, 1997.*

Anon., "Dow Dogs Will Have Their Day, Fans Say Critics Call Strategy Overused, Outdated Dogs of 1997 Lost Their Bite," St, Louis Post–Dispatch, Five Star Lift edition, p. C5, Friday, Jan. 9, 1998.*

Anon., "Van Kampen Sells 'Dow Dog' Annuity," Bank Mutual Fund, Feb. 16, 1998, vol. 6, No. 7, p. 1.*

Liberman, G., "Fund Group Unveils Index–Linked Unit Investment Trusts," Mutual Fund Market News, vol. VI, No. 30, p. 2, Aug. 3, 1998.*

* cited by examiner

# FIG. 1





FIG. 2

US 6,920,432 B1

**1**

# TECHNIQUES OF SELECTING SECURITIES FOR A PORTFOLIO USING BUYBACK RATIO AND DIVIDEND YIELD

## BACKGROUND OF THE INVENTION

The present invention generally relates to techniques for selecting a securities portfolio for investment. More particularly, the present invention relates to an investment strategy for selecting a securities portfolio based upon two criteria: dividend yields and buyback ratios. One investment objective of the present invention is to provide an above-average total return from the portfolio through investing in stocks with high dividend yields and high buyback ratios.

A unit investment trust (UIT) is a professionally selected, diversified portfolio of stocks, bonds, or other securities that remains as a fixed portfolio throughout the life of the trust. Investors in a UIT purchase units, which represent an undivided ownership in the entire portfolio. Unlike mutual funds, in which the portfolio is actively managed and traded and continuously changes, UITs generally remain fixed for a predetermined period of time. Portfolios are designed to fill a variety of investment needs and risk tolerance levels. They fall into primarily two categories, equity and fixed income.

Equity portfolios are typically classified as either strategy portfolios or sector portfolios. Strategy portfolios follow predetermined investment criteria for selecting the stocks for the portfolio. All strategies have three inherent qualities:

1. Simplicity: The strategies seek to out-perform specified indices by selecting portfolios using sound, fundamental screens that reflect the historical behavior of the securities.

2. Resilience: The strategies must show back-tested results and have staying power even through bear markets.

3. Discipline: The strategies dictate which stocks are chosen for the portfolio; no emotional judgments are made and the strategies always remain the same.

Heretofore, investment strategies have been illustrated in U.S. Pat. No. 5,978,778 issued to O'Shaughnessy on Nov. 2, 1999 and U.S. Pat. No. 5,132,899 issued to Fox on Jul. 21, 1992. However, these investment strategies are not the same as the method of the present invention.

## SUMMARY OF THE INVENTION

A first embodiment of the invention is useful for selecting securities from a group of available securities for an investment portfolio. In such an environment, the first embodiment comprises collecting the dividend yields and buyback ratios of the group of available securities. At least some of the available securities are ranked according to predetermined criteria comprising a predetermined relationship between the collected dividend yields and the collected buyback ratios to form a group of ranked securities. At least some of the ranked securities are selected to form a group of selected securities.

A second embodiment of the invention is useful for selecting securities from a group of available securities having dividend yields and buyback ratios for an investment portfolio. The second embodiment comprises a memory storing the dividend yields and buyback ratios of the group of available securities. A processor is programmed to rank at least some of the available securities according to predetermined criteria comprising a predetermined relationship between the collected dividend yields and the collected buyback ratios to generate a group of ranked securities. An

**2**

output unit indicates in human readable form at least the ranked securities.

By using the foregoing techniques, dividend yields and buyback ratios may be used in an investment strategy attempting to obtain above-average total returns. These and other features of the present invention are discussed or are apparent in the following detailed description of the preferred embodiments of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic flow chart depicting the steps in an exemplary method of selection of securities.

FIG. 2 is a schematic block diagram of a computer system embodying one form of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The security selection techniques disclosed in this specification may be used in an investment strategy which seeks to outperform a typical index by adhering to a disciplined investment process. The first step in this strategy is defining the universe of securities for potential investment. In one embodiment of the present invention, the technique begins with using a database of stocks of companies listed in the Dow Jones Industrial Average ("DJIA"), which consists of 30 U.S. stocks chosen by the editors of *The Wall Street Journal* as being representative of the broad market and of American industry. However, the present invention is not intended to be limited to just the DJIA, or even to stocks; any type of security meeting the selection criteria may be utilized. Moreover, the present invention is not limited to any particular database of securities; any group of securities, including one developed by the user of the present technique, could be substituted for the DJIA.

The present techniques enable selection of securities from the group of securities based upon criteria including dividend yields and buyback ratios. By looking at dividend yields, the preferred embodiment seeks to uncover stocks that may be out of favor or undervalued. Regular dividends are common for established companies and have typically accounted for a large portion of the total return on stocks. Historically, companies rewarded shareholders in the form of dividend payments.

The preferred embodiment also looks at buyback ratios. More recently, many companies have turned to stock reduction programs as a tax efficient way to bolster their stock prices and reward shareholders. Companies which have reduced their shares through a share buyback program may provide a strong cash flow position and, in turn, high quality earnings. Buyback ratio is determined by subtracting one from the ratio of a company's shares of common stock outstanding 12 months prior to the initial date of deposit divided by a company's shares of common stock outstanding as of the business day prior to the initial date of deposit.

Referring to FIG. 1, a stock database 11 is formed by collecting data using, for example, a keyboard 50 of a conventional personal computer 20 (FIG. 2). The data collection includes the names of, or a representation of, the thirty (30) stocks that make up the DJIA. The names of the 30 stocks, or their symbols or other representative indicia, are included in the database 11 (FIG. 1) which is stored in a conventional computer memory 30 (FIG. 2).

In addition to the identity of the 30 stocks, other data related to each stock may also be stored in the database 11 and memory 30 in association with its respective stock

US 6,920,432 B1

3

name. Such information may include (1) dividend yield and (2) buyback ratio.

In the step indicated by the diagram block 13 (FIG. 1), the stocks in the database 11 are ranked by any conventional means, such as by sorting or organizing, according to the magnitude of the sum of each stock's dividend yield and buyback ratio. The sorting may be done by organizing the stocks in descending order of these sums. The ranked stock names are written to File A, as shown in the diagram block 15. The ranking is executed by a processor 40 of computer system 20. Processor 40 may be a microprocessor, micro-controller or any integrated circuit capable of logical and arithmetic operations.

In addition to buyback ratio and dividend yield, various criteria may be used to rank the stocks, such as capitalization. However, in the preferred embodiment, only the dividend yield and buyback ratio for each stock are used for ranking. That information may be initially stored in database 11 and memory 30.

The results of the ranking are sent to a conventional output device, such as display monitor 60 having a display face 70. Alternatively, the results may be printed by a printer (not shown). The input and display process may be aided by a conventional computer mouse 80.

After File A has been completed, the step indicated by diagram block 17 is performed in which a desired number (for example, 10) of stocks from File A with the highest combined dividend yields and buyback ratios are selected. This part of the process may or may not be performed by computer system 20. Since the stocks are sorted in File A in descending order of the sum of each stock's dividend yield and buyback ratio, this selection is performed by identifying the first 10 stocks in the ordered list. As will suggest itself, other modes of selection may be used.

The identities of those 10 stocks are stored in File B as shown at diagram block 19. As understood, File B may be a file different from File A, or non-selected stocks in File A may be deleted to form File B. File B also may be stored in memory 30.

A computer program capable of executing the steps described in connection with FIG. 1 may be stored in memory 30 and on a conventional computer readable medium, such as a floppy disk 90 (FIG. 2) or a CD-ROM. Files A and B also may be stored on such medium.

In an exemplary embodiment, a portfolio of the top 10 stocks of File B will represent one series of a unit investment trust. With the deposit of the selected shares of stock, a percentage relationship among the securities in the trust's portfolio is established. In an exemplary embodiment, the percentages of stock holdings in the portfolio will be approximately equal on the initial date of deposit. Since the prices of the selected securities will fluctuate daily, the ratio of securities in the trust, on a market value basis, will also change daily.

4

The trust will terminate on a mandatory termination date, which will typically be approximately 13 months from the initial date of deposit. Twelve-month termination dates are also contemplated. However, the duration of the investment vehicle is not limited to any particular length of time.

Some possible features and benefits of such a unit investment trust or other pooled vehicle or investment account include (although these are not essential features of the present invention): immediate liquidity, in-kind distribution, low expenses, a dividend reinvestment option, and an exchange option. The present techniques allow a purchaser to acquire a quality portfolio of attractive common stocks in one convenient purchase.

The present invention is not limited to the selection of securities for funding a unit investment trust. Securities may be selected for funding any type of pooled investment vehicle or investment account. The present invention could also be used in connection with variable annuities, open-ended mutual funds, etc.

Price volatility is a potential risk factor relevant to a unit investment trust selected pursuant to the present method. Since the trust invests in common stocks of U.S. companies, the value of the trust's units will fluctuate with changes in the value of these common stocks. Common stock prices fluctuate for several reasons, including changes in investors' perceptions of the financial condition of an issuer or the general condition of the relevant stock market, or when political or economic events affecting the issuers occur. Because the trust would not be managed, stocks would not be sold in response to or in anticipation of market fluctuations, as is common in managed investments. The present techniques may use dividend yield as part of its selection criteria, which is a contrarian strategy in which the securities selected share qualities that have caused them to have lower share prices or higher dividend yields than other common stocks in their peer group.

The use of dividends also presents a risk to an investor. There is no guarantee that the issuers of the securities will declare dividends in the future or that if declared they will either remain at current levels or increase over time.

From time to time, various legislative initiatives are proposed in the United States and abroad which may have a negative impact on certain of the companies represented in the trust. In addition, litigation regarding any of the issuers of the securities or of the industries represented by these issuers, may negatively impact the share prices of these securities. The impact of any pending or threatened litigation on the share prices of the securities cannot be predicted.

In an exemplary embodiment, the following Table would illustrate one possible portfolio:

TABLE

| Number of Shares | Issuer of Security | % of Aggregate Offering Price | Market Value per Share ($) | Cost of Securities to Trust ($) | Current Dividend Yield (%) |
|---|---|---|---|---|---|
| 245 | AlliedSignal Inc. | 10 | 60.500 | 14.823 | 1.12 |
| 359 | The Boeing Company | 10 | 41.313 | 14.831 | 1.36 |
| 270 | Caterpillar Inc. | 10 | 55.000 | 14.850 | 2.36 |
| 224 | Eastman Kodak Company | 10 | 66.438 | 14.882 | 2.65 |
| 191 | Exxon Corporation | 10 | 77.875 | 14.874 | 2.26 |

US 6,920,432 B1

5           6

TABLE-continued

| Number of Shares | Issuer of Security | % of Aggregate Offering Price | Market Value per Share ($) | Cost of Securities to Trust ($) | Current Dividend Yield (%) |
|---|---|---|---|---|---|
| 208 | General Motors Corporation | 10 | 71.250 | 14.820 | 2.81 |
| 155 | International Business Machines Corporation | 10 | 95.875 | 14.861 | 0.50 |
| 196 | Merck & Co., Inc. | 10 | 75.938 | 14.884 | 1.53 |
| 107 | J. P. Morgan & Company, Inc. | 10 | 139.313 | 14.906 | 2.84 |
| 591 | Philip Morris Companies, Inc. | 10 | 25.125 | 14.849 | 7.64 |

While particular elements, embodiments and applications of the present invention have been shown and described, it is understood that the invention is not limited thereto since modifications may be made by those skilled in the art, particularly in light of the foregoing teaching. It is therefore contemplated by the appended claims to cover such modifications and incorporate those features which come within the spirit and scope of the invention.

What is claimed is:

1. A method utilizing a computer for selecting securities from a group of available securities for an investment portfolio comprising:

collecting the dividend yields and buyback ratios of said group of available securities;

ranking at least some of the available securities according to predetermined criteria comprising a predetermined relationship between said collected dividend yields and said collected buyback ratios to form a group of ranked securities;

selecting at least some of the ranked securities to form a group of selected securities;

wherein at least one of the steps of collecting, ranking, and selecting is carried out by a computer.

2. The method of claim 1 wherein said group of available securities comprises the 30 stocks that make up the Dow Jones Industrial Average.

3. The method of claim 1 wherein said predetermined criteria consist only of said predetermined relationship between said collected dividend yields and said collected buyback ratios.

4. The method of claim 1 wherein said selecting comprises selecting a predetermined number of said ranked securities.

5. The method of claim 4 wherein said predetermined number is 10 or less.

6. The method of claim 1 wherein said method further includes purchasing at least some of said group of selected securities to form a group of purchased securities.

7. The method of claim 6 wherein said method further includes creating a unit investment trust comprising said purchased securities.

8. The method of claim 7 wherein the percentages of said purchased securities holdings in said unit investment trust are approximately equal.

9. The method of claim 7 wherein said unit investment trust has a life of 13 months or more.

10. The method of claim 6 wherein said method further includes creating a pooled investment vehicle comprising said purchased securities.

11. The method of claim 6 wherein said method further includes creating a variable annuity comprising said purchased securities.

12. The method of claim 6 wherein said method further includes creating an investment account comprising said purchased securities.

13. A computer-readable medium bearing a computer program containing instruction which, when implemented by a general purpose computer, cause the computer to carry out the steps of:

collecting the dividend yield and buyback ratios of said group of available securities;

ranking at least some of the available securities according to predetermined criteria comprising a predetermined relationship between said collected dividend yield and said collected buyback ratios to form a group of ranked securities, the predetermined relationship comprising the magnitude of the sum of said collected dividend yields and said collected buyback ratios; and

selecting at least some of the ranked securities having the highest magnitude of the sum of said collected dividend yields and said collected buyback ratios to form a group of selected securities.

14. Apparatus for selecting securities from a group of available securities having dividend yields and buyback ratios for an investment portfolio comprising:

a memory storing the dividend yields and buyback ratios of said group of available securities;

a processor programmed to rank at least some of the available securities according to predetermined criteria comprising a predetermined relationship between said collected dividend yields and said collected buyback ratios to generate a group of ranked securities; and

an output unit indicating in human readable form at least said ranked securities.

15. The apparatus of claim 14 wherein said group of available securities comprises the 30 stocks that make up the Dow Jones Industrial Average.

16. The apparatus of claim 1 wherein said predetermined criteria consist only of said predetermined relationship between said collected dividend yields and said collected buyback ratios.

17. The apparatus of claim 14 wherein said processor selects a predetermined number of said ranked securities.

18. The apparatus of claim 17 wherein said predetermined number is 10 or less.

* * * * *