**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIRST TRUST PORTFOLIOS L.P. | ) | |
| an Illinois limited partnership, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08CV4853 |
| | ) | |
| JACKSON NATIONAL LIFE INSURANCE | ) | JUDGE GUZMAN |
| COMPANY, | ) | MAGISTRATE JUDGE SCHENKIER |
| a Michigan company, | ) | |
| JACKSON NATIONAL LIFE INSURANCE | ) | JURY TRIAL DEMANDED |
| COMPANY OF NEW YORK, | ) | |
| a New York company, | ) | |
| JACKSON NATIONAL LIFE | ) | |
| DISTRIBUTORS, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| JNL VARIABLE FUND, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| JACKSON NATIONAL ASSET | ) | |
| MANAGEMENT, LLC, | ) | |
| a Michigan limited liability company, | ) | |
| JNL INVESTORS SERIES TRUST, | ) | |
| a Massachusetts business trust, and | ) | |
| MELLON CAPITAL MANAGEMENT | ) | |
| CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**JACKSON'S AMENDED ANSWER AND COUNTERCLAIMS**

Defendants Jackson National Life Insurance Company ("JNL"), Jackson National Life Insurance Company of New York ("JNLNY"), Jackson National Life Distributors, LLC ("JNLD"), JNL Variable Fund, LLC ("JNL Variable Fund"), Jackson National Asset Management, LLC ("JNAM"), and JNL Investors Series Trust ("JNL Trust") (collectively "Jackson"), by and through their attorneys, respectfully submit this Amended Answer and Counterclaims to the Complaint filed by First Trust Portfolios L.P. ("First Trust").

## THE PARTIES

1.      First Trust Portfolios L.P. is a limited partnership organized and existing under the laws of the state of Illinois, with its principal place of business at 1001 Warrenville Road, Lisle, IL 60532. First Trust Portfolios L.P. is the largest independent unit investment trust sponsor in North America.

ANSWER:      Jackson lacks sufficient knowledge to form a belief as to the truth of the allegations in paragraph 1 and therefore denies the allegations.

2.      On information and belief, JNL is a stock life insurance company organized and existing under the laws of the state of Michigan, with its principal place of business at 1 Corporate Way, Lansing, MI 49851, and is wholly owned by Prudential plc, a publicly traded life insurance company in the United Kingdom. Further, on information and belief, JNL is authorized to conduct life insurance and annuity business in all states except New York.

ANSWER:      Admitted.

3.      On information and belief, JNLNY has its principal place of business and home office in Purchase, New York. JNLNY issues variable annuities and life insurance products, which are distributed by Jackson National Life Distributors, LLC. JNLNY is a subsidiary of JNL and an indirect subsidiary of Prudential plc, a company incorporated and with its principal place of business in the United Kingdom.

ANSWER:      Admitted.

4.      JNL Variable Fund is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business at 1 Corporate Way, Lansing, MI 48951.

ANSWER:      Admitted.

5.      On information and belief, JNL Variable Fund also conducts business from offices located at 225 West Wacker Drive, Chicago, Illinois 60606.

ANSWER:      Admitted.

6.      On information and belief, JNL Variable Fund offers interests in separate funds, which are comprised of two groups – Disregarded Entity Funds and Regulated Investment Company Funds.

2

ANSWER:     Admitted.


7.    The interests of the JNL Variable Fund are sold to life insurance company separate accounts to fund the benefits of variable insurance contracts and to regulated investment companies.

ANSWER:     Admitted.


8.    JNL Variable Fund currently offers interests in a number of separate funds, including but not limited to the JNL/Mellon Capital Management VIP Fund.

ANSWER:     Admitted.


9.    The management of the business and affairs of the JNL Variable Fund is the responsibility of the Board of Managers of the JNL Variable Fund.

ANSWER:     Admitted.


10.   JNAM is a limited liability company organized and existing under the laws of the state of Michigan with its principal place of business in Chicago, Illinois.  JNAM is a wholly owned subsidiary of JNL.

ANSWER:     Jackson admits that JNAM is a limited liability company organized and existing under the laws of the state of Michigan and is a wholly owned subsidiary of JNL. Jackson denies the remaining allegations in paragraph 10.


11.   JNAM is the investment advisor to the JNL Variable Fund and provides the JNL Variable Fund with professional investment supervision and management.

ANSWER:     Admitted.


12.   On information and belief, Mellon Capital is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 50 Fremont, Suite 3900, San Francisco, CA 94105.  On information and belief, Mellon Capital is a wholly owned subsidiary of Bank of New York Mellon Corporation, a publicly traded financial holding company.

ANSWER:     Admitted.

13. As the Adviser, JNAM has selected Mellon Capital as Sub-Adviser to manage the investment and reinvestment of assets of the Funds associated with the interests of JNL Variable Fund currently being offered and sold.

ANSWER: Admitted.


14. JNAM, the Adviser, monitors the compliance of Mellon Capital, the Sub-Adviser, with the investment objectives and related policies of each Fund and reviews the performance of Mellon Capital and reports periodically on such performance to the Board of Managers of the JNL Variable Fund.

ANSWER: Admitted.


15. As compensation for its services, JNAM receives a fee from the JNL Variable Fund computed separately for each Fund associated with the interests of JNL Variable Fund currently being offered and sold. The fee for each Fund is stated as an annual percentage of the net assets of the Fund. The fee, which is accrued daily and payable monthly, is calculated on the basis of the average net assets of each Fund.

ANSWER: Admitted.


16. Under the terms of the Sub-Advisory Agreement between Mellon Capital and JNAM (the Adviser), Mellon Capital manages the investment and reinvestment of the assets of each Fund, subject to the oversight and supervision of the JNAM and the Board of Managers of the JNL Variable Fund.

ANSWER: Admitted.


17. Mellon Capital formulates a continuous investment program for each Fund associated with the interests of JNL Variable Fund currently being offered and sold, consistent with the Fund's investment objectives and policies outlined in the applicable Prospectus. Mellon Capital implements such programs by purchases and sales of securities and regularly reports to JNAM and the Board of Managers of the JNL Variable Fund with respect to the implementation of such programs.

ANSWER: Jackson admits that Mellon administers an investment program for each Fund associated with the interests of JNL Variable Fund currently being offered and sold, consistent with the Fund's investment objectives and policies outlined in the applicable Prospectus. Mellon also implements such programs by purchases and sales of securities and regularly reports to JNAM and the Board of Managers of the JNL Variable Fund with respect to

4

the implementation of such programs. Jackson denies the remaining allegations in paragraph

17.

     18.     The individuals primarily responsible for the day-to-day management of JNL Variable Fund's portfolio are Susan Ellison, Richard A. Brown, and Karen Q. Wong, all of whom are believed to be employees of Mellon Capital.

     ANSWER:     Jackson admits that Richard A. Brown and Karen Q. Wong, both of whom

are believed to be employees of Mellon Capital, have responsibilities relating to the

management of JNL Variable Fund's portfolio. Jackson denies the remaining allegations in

paragraph 18.

     19.     As compensation for its services, Mellon Capital receives a fee from the Adviser computed separately for each Fund, stated as an annual percentage of the net assets of such Fund. The SAI contains a schedule of the management fees the Adviser currently is obligated to pay Mellon Capital out of the advisory fee it receives from each Fund.

     ANSWER:     Admitted.

     20.     JNAM provides the following oversight and evaluation services to the JNL/Mellon Capital Management VIP Fund, including, but not limited to performing initial due diligence on prospective Sub-Advisers for the Funds; monitoring the performance of Sub-Advisers; communicating performance expectations to the Sub-Advisers, and ultimately recommending to the Board of Managers of the JNL Variable Fund whether a Sub-Adviser's contract should be renewed, modified or terminated.

     ANSWER:     Admitted.

     21.     In addition to the investment advisory fee, JNL/Mellon Capital Management VIP Fund pays JNAM an administrative fee of 0.15% of the average daily net assets of each Fund.

     ANSWER:     Admitted.

     22.     Interests in the JNL/Mellon Capital Management VIP Fund have been and are currently sold to regulated investment companies and to separate accounts of JNL and JNLNY to fund the benefits under certain variable annuity and variable life contracts.

<u>ANSWER:</u>    Admitted.

23.    JNL and JNLNY have purchased and continue to purchase interests in the JNL/Mellon Capital Management VIP Fund at net asset value using premiums received on variable annuity and/or variable life contracts issued by JNL or JNLNY. JNL and JNLNY use the interests in JNL/Mellon Capital Management VIP Fund to fund the benefits under certain variable annuity and variable life contracts. Interests in the JNL/Mellon Capital Management VIP Fund are not available to the general public directly.

<u>ANSWER:</u>    Admitted.

24.    On information and belief, JNL Investors Series Trust ("JNL Trust") is an open-end management investment company organized under the laws of the Commonwealth of Massachusetts, by a Declaration of Trust dated July 28, 2000. On information and belief, JNL Trust has a principal place of business at 85 State Street, Boston, MA 02109. On information and belief, JNL Trust has offered and currently offers A and C Class shares of separate series of Funds, including but not limited to the Jackson Perspective VIP Fund. The JNL Trust is registered with the United States Securities and Exchange Commission ("SEC") as an investment company under the Investment Company Act of 1940, as amended, whose shares are registered with the SEC under the Securities Act of 1933, as amended.

<u>ANSWER:</u>    Jackson admits that JNL Trust is an open-end management investment company organized under the laws of the Commonwealth of Massachusetts, by a Declaration of Trust dated July 28, 2000.  Jackson also admits that JNL Trust has offered and currently offers A and C Class shares of separate series of Funds, including but not limited to the Jackson Perspective VIP Fund.  Jackson further admits that JNL Trust is registered with the United States SEC as an investment company under the Investment Company Act of 1940, as amended, whose shares are registered with the SEC under the Securities Act of 1933, as amended. Jackson denies the remaining allegations in paragraph 24.

25.    JNL Trust currently offers shares in Funds that are a series of separate mutual fund portfolios within a single trust, each with a specific investment objective. Jackson Perspective VIP Fund is one such Fund. There are 19 portfolios within the JNL Trust.

ANSWER:    Admitted.


26.    Officers of the JNL Trust manage its day-to-day operations and are responsible to the Trust's Board of Trustees.  The Trustees set broad policies for each Fund and choose the Trust's officers.

ANSWER:    Admitted.


27.    JNAM is the investment Adviser to JNL Trust, pursuant to an Investment Advisory and Management Agreement. JNAM provides the JNL Trust with professional investment supervision and management.

ANSWER:    Admitted.


28.    Mellon Capital serves as Sub-Adviser to Jackson Perspective VIP Fund and conducts day-to-day management. Pursuant to Mellon Capital's Sub-Advisory Agreement with JNAM, Mellon Capital makes investment decisions for the Jackson Perspective VIP Fund, including determinations as to the purchase and sale of securities for the Fund and the disposition of assets for the Fund.

ANSWER:    Admitted.


29.    Richard Brown and Karen Wong have been and are portfolio managers for the Jackson Perspective VIP Fund. Both are believed to be employees of Mellon Capital.

ANSWER:    Admitted.


30.    As compensation for its services, Mellon Capital receives fees from JNAM computed separately for the Jackson Perspective VIP Fund. The Sub-Adviser's fee for the Jackson Perspective VIP Fund is stated as an annual percentage of the net assets of the Fund, and is calculated based on the average net assets of the Fund. The management fee JNAM currently is obligated to pay Mellon Capital out of the advisory fees that JNAM receives from the Jackson Perspective VIP Fund ranges from 0.12% to 0.015%.

ANSWER:    Admitted.


31.    Jackson National Life Distributors LLC ("JNLD"), 7601 Technology Way, Denver, Colorado 80237, is the distributor of the shares of the Jackson Perspective VIP Fund, which are offered for sale on a continuous basis. JNLD is a wholly owned

subsidiary of JNL. JNLD currently serves as distributor for other investment companies advised by JNAM and for variable contracts issued by JNL and JNLNY.

ANSWER: Admitted.

32. JNAM monitors and reviews the performance of Mellon Capital and the Jackson Perspective VIP Fund. In providing this oversight function, JNAM regularly reports to the Jackson Perspective VIP Fund Board related to Mellon Capital's management, trading and compliance functions. JNAM does not make individual investment decisions on behalf of the Jackson Perspective VIP Fund. JNAM does not have a portfolio management department and does not operate a trading desk. JNAM provides the Jackson Perspective VIP Fund with various services, including but not limited to compliance, fund accounting, transfer agency services, due diligence, and administrative services.

ANSWER: Jackson admits that JNAM reviews the performance of Mellon Capital and the Jackson Perspective VIP Fund, and that JNAM does not make individual investment decisions on behalf of the Jackson Perspective VIP Fund. Jackson further admits that JNAM does not have a portfolio management department and does not operate a trading desk. Jackson also admits that JNAM provides the Jackson Perspective VIP Fund with various services, including compliance, fund accounting, due diligence and administrative services. Jackson denies the remaining allegations in paragraph 32.

33. On information and belief, the Jackson Perspective VIP Fund underlies certain variable products sponsored by JNL and/or JNLNY, and is primarily sold to the separate accounts of these variable products.

ANSWER: Denied.

34. On information and belief, JNL sells shares in the Jackson Perspective VIP Fund to the public as a retail mutual fund.

ANSWER: Denied.

35. On information and belief, JNLNY sells shares in the Jackson Perspective VIP Fund to the public as a retail mutual fund.

ANSWER: Denied.

8

## JURISDICTION AND VENUE

36. This action arises under the Patent Laws of the United States (35 U.S.C. §§ 1 *et seq.*) and seeks damages and injunctive relief as provided in 35 U.S.C. §§ 281 and 283-285.

ANSWER:    Jackson admits that First Trust's complaint purports to state a claim under the Patent Laws of the United States and that it seeks damages and injunctive relief.

37. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

ANSWER:    The allegations in paragraph 37 of subject matter jurisdiction are conclusions of law to which no response is required.  To the extent a response is required, Jackson admits that the court has subject matter jurisdiction, and otherwise denies the allegations.

38. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

ANSWER:    The allegations of paragraph 38 are conclusions of law to which no response is required.  To the extent a response is required, Jackson does not contest venue in this district for purposes of this Action and otherwise denies the allegations.

## BACKGROUND

39. In 1998, representatives of the JNL Defendants and First Trust commenced a dialogue about implementing into Jackson National Life Insurance Company's variable annuity products certain investment strategies used by First Trust Portfolios L.P in its unit investment trusts.

ANSWER:    Denied except that Jackson admits that in or about 1999 representatives of First Trust Advisors LP and Jackson National Financial Services discussed the use of certain investment strategies in connection with variable annuity products.

40.    As a result of this dialogue, First Trust facilitated the implementation of five successful investment strategies in the variable annuity products of Jackson National Life Insurance. First Trust worked with JNL Variable Fund to implement variable annuity funds using these five investment strategies.

ANSWER:    Denied except that Jackson admits that representatives of First Trust Advisors LP worked with representatives of Jackson National Financial Services to furnish an investment program for the JNL Variable Fund LLC.

41.    As Sub-Advisor to JNL Variable Fund, First Trust managed the investment and reinvestment of the assets of each of JNL Variable Fund's variable annuity funds.

ANSWER:    Jackson admits that as a Sub-Advisor First Trust Advisors made investment decisions for the assets of certain Series issued by the JNL Variable Fund. Jackson denies the remaining allegations in paragraph 41.

42.    In December 2003, JNL Variable Fund and JNAM terminated their relationship with First Trust. In First Trust's place, JNL Variable Fund and JNAM retained the firm of Curian Capital, LLC. The sub-advisory relationship between JNL Variable Fund, JNAM, and Curian Capital, LLC lasted approximately two months.

ANSWER:    Jackson admits that in or about December 2003, JNAM recommended the replacement of First Trust Advisors LP and, after obtaining Board approval and a shareholder vote, subsequently retained the firm of Curian Capital LLC, for approximately two months. Jackson denies any remaining allegations in paragraph 42.

43.    Subsequently, JNL Variable Fund and JNAM solicited requests for proposals from numerous investment firms, including First Trust and Mellon Capital. Ultimately, Mellon Capital was selected as the new Sub-Advisor for JNL Variable Fund.

ANSWER:    Jackson admits that JNAM solicited requests from First Trust Portfolios LP, Mellon Capital and other firms, and ultimately selected Mellon Capital as a sub-advisor for the JNL Variable Fund. Jackson denies any remaining allegations in paragraph 43.

44. First Trust developed other innovative strategies, not provided to JNL Variable Fund or JNAM for use in variable annuity products, including a method of selecting a portfolio of securities using buyback ratio and dividend yield.

ANSWER:    Jackson lacks sufficient knowledge to form a belief as to the allegations in paragraph 44 and therefore denies the allegations.

45. Without authorization from First Trust, JNL Variable Fund copied First Trust's security selection method for use in JNL Variable Fund's JNL/Mellon Capital Management VIP Fund. Further, the JNL Trust copied the method for use in the JNL Investors Series' Jackson Perspective VIP Fund.

ANSWER:    Denied.

## INFRINGEMENT OF U.S. PATENT NO. 6,920,432

46. First Trust incorporates paragraphs 1 through 45 as if fully set forth herein.

ANSWER:    Jackson repeats, restates and incorporates its answers in entirety to paragraphs 1 through 45 as its answer to paragraph 46.

47. On July 19, 2005, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,920,432 ("the '432 patent") titled "Techniques of Selecting Securities For A Portfolio Using Buyback Ratio and Dividend Yield." A true and correct copy of the '432 patent is attached as Exhibit A to this Complaint. Through assignment to Nike Securities, and a later name change, First Trust Portfolios L.P. acquired and continues to maintain all rights, title, and interest in and to the '432 patent, including the right to sue and collect damages for past infringement.

ANSWER:    Jackson admits that what appears to be a true and correct copy of the '432 patent is attached to the Complaint.  Jackson lacks sufficient knowledge to form a belief as to the remaining allegations in paragraph 47 and therefore denies the allegations.

48. The investment objective of the JNL/Mellon Capital Management VIP Fund and the Jackson Perspective VIP Fund ("the VIP Funds") is total return. The VIP Funds seek to achieve that objective by investing in the common stocks of companies that are identified by a model based on six separate specialized strategies. One of those six strategies is the Dow Core 5 Strategy ("DC5 Strategy").

ANSWER:    Admitted.

49.    The DC5 Strategy seeks to achieve its objective by investing in a portfolio of DJIA stocks with high dividend yields and/or high buyback ratios and high return on assets. By analyzing dividend yields, the DC5 Strategy seeks to uncover stocks that may be out of favor or undervalued. The securities for the DC5 Strategy are selected only once annually on each Stock Selection Date set for the VIP Funds. The Stock Selection Date for the JNL/Mellon Capital Management VIP Fund is on or about January 1 of each year. The initial Stock Selection Date for the Jackson Perspective VIP Fund was on or about January 1, 2008. The next Stock Selection Date for the Jackson Perspective VIP Fund is expected to be on or about March 1, 2009. Thereafter, the Stock Selection Date for the Jackson Perspective VIP Fund will be 13 months after the prior Stock Selection Date. Buyback ratio is the ratio of a company's shares of common stock outstanding 12 months prior to each Stock Selection Date divided by a company's shares outstanding on each Stock Selection Date, minus "1."

ANSWER:    Jackson admits that the DC5 Strategy seeks to achieve its objective by investing in a portfolio of DJIA stocks with high dividend yields and/or high buyback ratios and high return on assets. Jackson further admits that by analyzing dividend yields, the DC5 Strategy seeks to uncover stocks that may be out of favor or undervalued. In addition, Jackson admits that the Stock Selection Date for the JNL/Mellon Capital Management VIP Fund is on or about January 1 of each year. Jackson further admits that the initial Stock Selection Date for the Jackson Perspective VIP Fund was on or about January 1, 2008; the next Stock Selection Date for the Jackson Perspective VIP Fund is expected to be on or about March 1, 2009; and that thereafter, the Stock Selection Date for the Jackson Perspective VIP Fund will be on or about 13 months after the prior Stock Selection Date. Jackson denies any remaining allegations in paragraph 49.

50.    On each Stock Selection Date applicable to the VIP Funds occurring after July 19, 2005, Mellon Capital has selected securities for the VIP Funds in accordance with the DC5 Strategy by carrying out at least the following process steps:

Step 1 – Mellon Capital ranked all 30 stocks contained in the DJIA by the sum of their dividend yield and buyback ratio;

12

Step 2 – Mellon Capital selected the 10 stocks with the highest sum of dividend yield and buyback ratio; and

Step 3 – From the 10 stocks selected above, Mellon Capital selected the five stocks with the greatest increase in return on assets in the most recent year as compared to the previous year.

ANSWER:    Jackson lacks sufficient knowledge about the precise meaning of the first

three lines of paragraph 50 and therefore denies the allegations in paragraph 50.

51.    On information and belief, a reasonable opportunity for discovery will show that Mellon Capital and JNAM have infringed and continue to infringe one or more claims of the '432 patent in violation of 35 U.S.C. § 271(a).

ANSWER:    Denied.

52.    On information and belief, a reasonable opportunity for discovery will show that JNL Variable Fund, JNL Trust, JNLD, JNL, and JNLNY have each infringed and continue to infringe one or more claims of the '432 patent in violation of 35 U.S.C. § 271(g).

ANSWER:    Denied.

53.    On information and belief, the JNL Defendants and Mellon Capital are engaging in willful and deliberate infringement of the '432 patent which justifies an increase in damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

ANSWER:    Denied.

54.    First Trust has sustained substantial damages as a result of the JNL Defendants' and Mellon Capital's acts of infringement.

ANSWER:    Denied.

55.    The JNL Defendants' and Mellon Capital's continued infringement of the '432 patent is causing and will continue to cause irreparable injury to First Trust unless the JNL Defendants' and Mellon Capital's infringement activities are enjoined by this Court.

ANSWER:    Denied.

## ANSWER TO PRAYER FOR RELIEF

Jackson denies that First Trust is entitled to any of the relief requested in the Complaint's prayer for relief.

## ANSWER TO OTHER ALLEGATIONS

All allegations not heretofore admitted are here and now denied.

## <u>AFFIRMATIVE DEFENSES</u>

### First Affirmative Defense

1.      Jackson does not infringe any valid and enforceable claim of the '432 patent.

### Second Affirmative Defense

2.      The '432 patent and all the claims therein are invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112.

### Third Affirmative Defense

3.      The '432 patent and all the claims therein are unenforceable due to inequitable conduct.

### Fourth Affirmative Defense

4.      All or some of First Trust's claims are barred by the doctrine of prosecution history estoppel.

### Fifth Affirmative Defense

5.      All or some of First Trust's claims are barred by the doctrine of estoppel.

### Sixth Affirmative Defense

6.      All or some of First Trust's claims are barred by the doctrine of laches.

### Seventh Affirmative Defense

7.      The Complaint fails to assert a claim for which relief may be granted.

**Reservation For Additional Affirmative Defenses**

8.      Jackson hereby reserves the right to assert additional affirmative defenses if such affirmative defenses are discovered during the course of this litigation.

## COUNTERCLAIMS

### PARTIES

9.      Jackson National Life Insurance Company, Jackson National Life Insurance Company of New York, Jackson National Life Distributors, LLC, JNL Variable Fund, LLC, Jackson National Asset Management, LLC and JNL Investors Series Trust ("Jackson") are named defendants in the Complaint in this case filed by First Trust Portfolios L.P.

10.     On information and belief, First Trust Portfolios L.P., formerly known as Nike Securities L.P. ("First Trust") is a limited partnership with its principal place of business in Wheaton, Illinois.  On information and belief, Nike Securities L.P. changed its name to First Trust Portfolios L.P. in or about 2002.

### JURISDICTION AND VENUE

11.     Pursuant to its Complaint in this case, First Trust purports to seek to hold Jackson liable for allegedly infringing one or more claims of U.S. Patent No. 6,920,432 (the "'432 Patent").  Jackson has denied infringement and has asserted that the claims of the '432 patent are invalid and unenforceable.  Consequently there is now an actual controversy between First Trust and Jackson.

12.     This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 2201 and 2202.  Venue is proper under 28 U.S.C. §§ 1391 and 1400, and by Counterdefendant's choice of forum.

## CONSOLIDATED FACTUAL ALLEGATIONS

### First Trust's Prosecution of the '432 Patent Application

13.     On August 15, 2007, First Trust filed with the U.S. Patent and Trademark Office ("PTO") an application that eventually led to the '432 Patent.

14.     Claim 1 of the originally-filed application for the '432 Patent provided as follows:

> 1.     A method utilizing a computer for selecting securities from a group of available securities for an investment portfolio, comprising:
>
> collecting the dividend yields and buyback ratios of said group of available securities;
>
> ranking at least some of the available securities according to predetermined criteria comprising a predetermined relationship between said collected dividend yields and said collected buyback ratios to form a group of ranked securities; and
>
> selecting at least some of the ranked securities to form a group of selected securities.

15.     On or about July 10, 2003, the Examiner rejected the claims of the '432 Patent Application as invalid based on the prior art.  In response to the rejection (and to overcome the Examiner's invalidity rejections), First Trust submitted amended claims on or about October 9, 2003.

16.     On or about December 5, 2003, the Examiner rejected the claims of the '432 Patent Application as invalid based on the prior art.  In response to the rejection (and to

overcome the Examiner's invalidity rejections), First Trust submitted amended claims on or about January 27 , 2004.

17. On or about February 2, 2004, the Examiner rejected the claims of the '432 Patent Application as invalid based on the prior art. In response to the rejection (and to overcome the Examiner's invalidity rejections), First Trust submitted amended claims on or about April 8, 2004.

18. On or about June 10, 2004, the Examiner rejected the claims of the '432 Patent Application as invalid based on the prior art. In response to the rejection (and to overcome the Examiner's invalidity rejections), First Trust submitted amended claims on or about August 8, 2004.

19. By virtue of the above amendments, First Trust changed Claim 1 by adding the following bolded and italicized language:

> 1. A method utilizing a computer for selecting securities from a group of available securities for an investment portfolio, ***the method*** comprising:
>
> collecting the dividend yields and buyback ratios of said group of available securities;
>
> ranking at least some of the available securities according to predetermined criteria comprising a predetermined relationship between said collected dividend yields and said collected buyback ratios to form a group of ranked securities; ***the predetermined relationship comprising the magnitude of the sum of said collected dividend yields and said collected buyback ratios***; **and**
>
> selecting at least some of the ranked securities ***having the highest magnitude of the sum of said collected dividend yields and said collected buyback ratios*** to form a group of selected securities; wherein at least one of the steps of collecting, ranking, and selecting is carried out by a computer.

17

20. By virtue of the above amendments, First Trust changed Claim 14 by adding the following bolded and italicized language:

> 14. Apparatus for selecting securities from a group of available securities having dividend yields and buyback ratios for an investment portfolio, *the apparatus* comprising:
>
> a memory storing the dividend yields and buyback ratios of said group of available securities;
>
> a processor programmed to rank at least some of the available securities according to predetermined criteria comprising a predetermined relationship between said collected dividend yields and said collected buyback ratios to generate a group of ranked securities, *the predetermined relationship comprising the magnitude of the sum of said collected dividend yields and said collected buyback ratios*; and
>
> an output unit indicating in human readable form at least some of said ranked securities *having the highest magnitude of the sum of said dividend yields and said buyback ratios*.

21. At no time during the prosecution of the '432 Patent Application did First Trust withdraw the above amendments of its claims.

22. Notwithstanding the above amendments, the PTO issued the '432 Patent containing a version of the claims that did not include the amendments that First Trust had made during the prosecution of the '432 Patent Application to overcome the Examiner's invalidity rejections.

23. At no time prior to filing the lawsuit in this case did First Trust attempt to correct the claims of the '432 Patent by restoring the amendments that First Trust had made during the prosecution of the '432 Patent to overcome the Examiner's invalidity rejections.

## First Trust's SEC Filings

24.     On August 11 or 12, 1999, First Trust filed with the Securities and Exchange Commission ("SEC") two Forms S-6 (collectively "1999 SEC Filings").

25.     In one of the two Forms S-6, First Trust disclosed an investment strategy known as the "Dow Target 5 Dividend Plus Portfolio Strategy" which consisted of the following steps:

> The Dow Target 5 Dividend Plus Portfolio Strategy.
>
> Step 1: We rank all 30 stocks contained in the DJIA by the sum of their dividend yield and buyback ratio as of the business day prior to the date of this prospectus.
>
> Step 2: We then select the ten stocks with the highest combined dividend yields and buyback ratios.
>
> Step 3: From the ten stocks selected in Step 2, we select the five stocks with the greatest return on assets over the previous 12 months for The Target 5 Dividend Plus Portfolio.

26.     In the second Form S-6, First Trust disclosed an investment strategy known as the "Dow Target 10 Dividend Plus Portfolio Strategy," which consisted of the following steps:

> The Dow Target 10 Dividend Plus Portfolio Strategy.
>
> Step 1: We rank all 30 stocks contained in the DJIA by the sum of their dividend yield and buyback ratio as of the business day prior to the date of this prospectus.
>
> Step 2: We then select the ten stocks with the highest combined dividend yields and buyback ratios for the Dow Target 10 Dividend Plus Portfolio.

27.     The 1999 SEC Filings thus disclosed the selection of securities based on the magnitude of the sum of the dividend yield and the buyback ratio.

**First Trust's Deception of the PTO**

28.     Because First Trust filed its 1999 SEC Filings more than a year before First Trust filed the '432 Patent Application, the 1999 SEC Filings were prior art to the inventions claimed in the '432 Patent Application.

29.     The Dow Target 5 Dividend Plus Portfolio Strategy, the Dow Target 10 Dividend Plus Portfolio Strategy, and the 1999 SEC Filings were each highly material prior art.

30.     In light of the Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings, the inventions claimed in the '432 Patent Application were invalid under 35 U.S.C. §§ 101, 102 and/or 103.

31.     First Trust was aware of its Dow Target 5 Dividend Plus Portfolio Strategy at all times during the prosecution of the '432 Patent Application

32.     First Trust Was aware of its Dow Target 10 Dividend Plus Portfolio Strategy at all times during the prosecution of the '432 Patent Application.

33.     First Trust was aware of its 1999 SEC Filings at all times during the prosecution of the '432 Patent Application.

34.     First Trust willfully concealed its Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings from the PTO with intent to deceive the PTO.

35.     The PTO would not have issued the '432 Patent if the PTO had been aware of the Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings.

36.     In addition to concealing the Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings, First Trust made numerous false and misleading misrepresentations with intent to deceive the PTO.

37.     For example, to overcome the Examiner's rejections, First Trust repeatedly claimed that the prior art did not disclose the selection of securities based on the magnitude of the sum of the dividend yield and the buyback ratio.  These false and misleading representations included (but are not limited to) the following material misstatements:

> None of the other prior art of record indicates that the magnitude of the sum of dividend yields and buyback ratios of available securities . . .

> \* \* \* \* \*

> This criterion is novel and inventive not only because it uses both the dividend yield and buyback ratio of a stock to evaluate the stock, but also because it creatively adds up two totally uncorrelated numbers showing different performance aspects of the stock in a very simple way and uses *the sum* of them in the predetermined criteria.

> \* \* \* \* \*

> Specifically, the Examiner ignored that the Fried reference does not disclose the elements of every claim of the present application concerning the magnitude of the sum of the collected dividend yields and the collected buyback ratios.  *No other applied prior art fills this gap.*

> \* \* \* \* \*

> Nothing in the references relied on by the Examiner teaches or suggested such a step [of selecting securities based on the magnitude of the sum of the dividend yield and the buyback ratio].

\*      \*      \*      \*

The Examiner has cited no prior art references teaching or suggesting that the sum of the buyback ratio and dividend yield of a stock is a direct measure of paid-out earnings, let alone references reaching or suggesting that paid-out earnings is useful for selecting securities.

\*      \*      \*      \*

The *wild conception* of adding up two uncorrelated performance data showing different aspects of a stock and then simply using the sum as a criterion to rank and select securities for an investment portfolio is not obvious but creative, *because no prior art had taught or suggested or given any hint that this might work*.

\*      \*      \*      \*

Because of the lack of teaching and suggestion and the *awkwardness* of *adding two different kinds of performance data up*, it is even not "obvious to try" to use the sum of dividend yields and buyback ratios for selecting securities . . .

38.     Each of the above statements was false and misleading because, as First Trust well knew, the Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy, and 1999 SEC Filings (among other prior art) disclosed the use of the sum of the dividend yield and buyback ratio as a method for selecting securities.

39.     To overcome the Examiner's rejections, First Trust also repeatedly claimed that the prior art did not disclose a motivation to use the sum of the dividend yield and buyback ratio as a criterion for selecting securities for an investment portfolio.  These false and misleading misrepresentations included (but are not limited to) the following material misstatements:

Nothing in the cited references provides any incentive or motive to use a sum as opposed to other predetermined relationship between dividend yield and buyback ratio.

\*      \*      \*      \*

> [I]t was . . . blatant speculation for the Examiner to say that . . . a person of ordinary skill in the art would have been motivated to use the sum of the two in the criteria for selecting securities for an investment portfolio.

40.　　Each of the above statements was false and misleading because, as First Trust well knew, the Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings, as well as several of the references cited during the prosecution of the '432 Patent Application, disclosed a motivation to add dividend yields and buyback ratios.

41.　　The Examiner expressly relied on First Trust's willful concealment and false and misleading representations in deciding to issue the '432 Patent.  Indeed, in issuing a Notice of Allowability, the Examiner emphasized that the prior art did not suggest a method of selecting securities based on the magnitude of the sum of the dividend yield and buyback ratio.

## First Trust's Bad Faith Patent Litigation Scheme

42.　　At all times material to these Counterclaims, First Trust knew that its '432 Patent was invalid in light of the Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy, 1999 SEC Filings and other prior art.

43.　　At all times material to these Counterclaims, First Trust knew that its '432 Patent was unenforceable because First Trust had obtained the patent by engaging in inequitable conduct before the PTO.

44.　　Beginning at least as early as May 2007 and continuing until the present, First Trust, in bad faith, embarked on a scheme to file sham patent litigation to directly interfere with

the business relationships of Jackson and Mellon and to otherwise cause competitive harm to Jackson and Mellon.

45.     It was part of this scheme that First Trust, in bad faith, filed sham patent infringement litigation against Jackson and Mellon based on a patent or patents that First Trust knew to be neither infringed, nor valid nor enforceable.

46.     It was part of this scheme that First Trust, in bad faith, filed sham patent litigation against Jackson and Mellon to force Jackson and Mellon to modify or abandon investment strategies that Jackson and Mellon offered to their customers.

47.     It was part of this scheme that First Trust, in bad faith, filed sham patent litigation against Jackson and Mellon to force Jackson to replace Mellon with First Trust as a sub-adviser for the Jackson funds.

48.     It was part of this scheme that First Trust, in bad faith, filed sham patent litigation against Jackson and Mellon to force Jackson and Mellon to divert time, money and resources to pay attorneys' fees and other costs and to otherwise defend against baseless allegations of patent infringement.

49.     In furtherance of this scheme, First Trust filed on May 30, 2007 a lawsuit falsely alleging that Jackson and Mellon infringed valid and enforceable claims of U.S. Patent No. 7,206,760 (the "'760 Patent").

50.     In furtherance of this scheme, First Trust used the '760 Patent litigation to force Jackson and Mellon to change their investment strategies to avoid incurring substantial attorneys' fees and other costs in defending against First Trust's false allegations.

24

51.     In furtherance of this scheme, First Trust filed the lawsuit in this case falsely alleging that Jackson and Mellon infringed valid and enforceable claims of the '432 Patent.

52.     At the time First Trust filed the lawsuit in this case, it knew (and any reasonable patent owner would have known) that First Trust had no valid and enforceable claim of infringement with respect to the '432 Patent for at least the following reasons:

>    (a)    the '432 Patent is invalid in light of the prior art, including First Trust's own Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings;
>
>    (b)    the '432 Patent is invalid because First Trust's 1999 SEC Filings constituted an invalidating "public use" of the claimed invention;
>
>    (c)    the '432 Patent is unenforceable because First Trust willfully concealed material prior art from the PTO during the prosecution of the '432 Patent Application.
>
>    (d)    the '432 Patent is unenforceable because First Trust made material misrepresentations to the PTO during the prosecution of the '432 Patent Application; and
>
>    (e)    the '432 Patent is invalid because it consists of a version of the claims that does not include the amendments that First Trust made to overcome the Examiner's invalidity rejections.

53.     First Trust has continued the prosecution of this lawsuit with actual knowledge that the '432 Patent is invalid and/or unenforceable.

54.     First Trust has continued the prosecution of this lawsuit with actual knowledge that the '432 Patent contains a version of the claims that does not include the amendments that First Trust made to overcome the Examiner's invalidity rejections.

### First Trust's False and Misleading Statements in the Martketplace

55.     It was part its patent litigation scheme that First Trust, in bad faith, caused false and misleading statements to be made to actual and potential customers of Jackson and Mellon concerning the patent litigation that First Trust had filed against Jackson and Mellon.

56.     On information and belief, beginning at least as early as late 2007 and continuing to the present, First Trust, acting in bad faith in the course of its business, falsely represented to existing and potential customers of Jackson and Mellon that First Trust had prevailed (or was prevailing, or was going to prevail) in patent litigation against Jackson and Mellon.

57.     On information and belief, beginning at least as early as late 2007 and continuing to the present, First Trust, acting in bad faith in the course of its business, falsely represented to existing and potential customers of Jackson and Mellon that Jackson and Mellon had infringed (or were infringing) valid and enforceable claims of First Trust's patents.

### Damages Incurred by Jackson and Mellon

58.     As a direct and proximate result of First Trust's sham litigation scheme, Jackson and Mellon have been forced to modify the investment strategies they offer their customers.

59.     As a direct and proximate result of First Trust's sham litigation scheme, Jackson and Mellon have been forced to divert time, money and resources to pay attorneys' fees and other costs and to otherwise defend against baseless allegations of patent infringement.

60.     On information and belief, as a direct and proximate result of First Trust's sham litigation scheme, Jackson and Mellon have been damaged in their competitive reputations.

61.     On information and belief, as a direct and proximate result of First Trust's sham litigation, Jackson and Mellon have lost business opportunities, including actual or potential customers.

62.     First Trust's bad faith conduct is continuing and will continue without intervention from the Court.

63.     Jackson and Mellon face continuing and irreparable injury from First Trust's knowing assertion of baseless and irresponsible claims of infringement.

**This Case is an "Exceptional Case" Under 35 USC § 285**

64.     35 U.S.C. § 285 vests district courts with the authority to award reasonable attorney fees to a prevailing party in "exceptional cases."  35 U.S.C. § 285.

65.     An "exceptional case" under § 285 is a case that involves "inequitable conduct before the [Patent Office]; litigation misconduct; vexatious, unjustified and otherwise bad faith litigation; a frivolous suit or willful infringement."  *Brasseler, U.S.A. v. Stryker Sales Corp.*, 267 F.3d 1370, 1378 (Fed. Cir. 2001).

66.     Under the above standard, this case presents at least six independent and alternative grounds for a finding of an "exceptional case."

67.     First, this case involves an attempt to enforce a patent obtained through inequitable conduct based on First Trust's willful concealment from the PTO of material prior art, including but not limited to First Trust's own Dow Target 5 Dividend Plus Portfolio Strategy, Dow Target 10 Dividend Plus Portfolio Strategy and 1999 SEC Filings.

68.     Second, this case involves an attempt to enforce a patent obtained through inequitable conduct based on First Trust's material misrepresentations to the PTO.

69.     Third, this case involves "vexatious, unjustified and otherwise bad faith litigation" based on First Trust's repeated attempts to enforce against Jackson and Mellon patents that First Trust knew, or should have known, were either not infringed or invalid and/or unenforceable.

70.     Fourth, this case involves "vexatious, unjustified and otherwise bad faith litigation" based on First Trust's attempt to enforce a patent that First Trust knew, or should have known, contained a version of the claims that does not include the amendments that First Trust made during the prosecution of the patent to overcome the Examiner's invalidity rejections.

71.     Fifth, this case involves a "frivolous suit" based on First Trust's attempt to enforce a patent that First Trust knew or should have known was invalid and/or unenforceable.

72.     Sixth, this case involves a "frivolous suit" based on First Trust's attempt to enforce a patent that First Trust knew or should have known, consists of a version of claims that does not include the amendments that First Trust made during the prosecution of the '432 Patent Application to overcome the Examiner's invalidity rejections.

## COUNT I
## DECLARATION OF NON-INFRINGEMENT

73.     Jackson repeats and reiterates paragraphs 1 through 72 above, as if set forth verbatim herein.

74.     Jackson has not made, used, sold, offered for sale, or imported (and is not now making, using, selling, offering for sale, or importing) any product that incorporates, either

literally or under the doctrine of equivalents, all of the limitations of any valid and enforceable claim of the '432 patent and, consequently, does not infringe such claims.

75.     Jackson has not engaged in, and is not engaging in, any activity that could be considered an inducement to infringe or contributory infringement of any valid and enforceable claim of the '432 patent.

**WHEREFORE**:  Jackson prays for judgment:

a)      Dismissing First Trust's Complaint with prejudice;

b)      Declaring that Jackson has not infringed any valid and enforceable claim of U.S. Patent No. 6,920,432;

c)      Declaring that this is an exceptional case under 35 U.S.C. § 285 and awarding Jackson its costs, attorneys' fees and expenses incurred in defending against the Complaint; and

d)      Granting Jackson such other and further relief as the Court deems appropriate.

## COUNT II
## DECLARATION OF PATENT INVALIDITY

76.     Jackson repeats and reiterates paragraphs 1 through 75 above, as if set forth verbatim herein.

77.     Each of the claims of the '432 patent is invalid under 35 U.S.C. §§ 101, 102, 103 and/or § 112.

**WHEREFORE:**  Jackson prays for judgment:

a)      Dismissing First Trust's Complaint with prejudice;

b)      Declaring that U.S. Patent No. 6,920,432 is invalid;

c)      Declaring that this is an exceptional case under 35 U.S.C. § 285 and awarding Jackson its costs, attorneys' fees and expenses incurred in defending against the Complaint; and

d)     Granting Jackson such other and further relief as the Court deems appropriate.

## COUNT III
## DECLARATION OF PATENT UNENFORCEABILITY

78.     Jackson repeats and reiterates paragraphs 1 through 77 above, as if set forth verbatim herein.

79.     The '435 Patent is unenforceable because First Trust failed to comply with the duty of candor required by 37 C.F.R. § 156, in the prosecution leading to the '432 Patent by making material misrepresentations to, and withholding material information from the PTO with an intent to deceive.

**WHEREFORE:** Jackson prays for judgment:

a)     Dismissing First Trust's Complaint with prejudice;

b)     Declaring that Jackson has not infringed any valid and enforceable claim of U.S. Patent No. 6,920,432;

c)     Declaring that U.S. Patent No. 6,920,432 is unenforceable and/or of no legal effect;

d)     Declaring that this is an exceptional case under 35 U.S.C. § 285 and awarding Jackson its costs, attorneys' fees and expenses incurred in defending against the Complaint; and

e)     Granting Jackson such other and further relief as the Court deems appropriate.

## COUNT IV
## UNFAIR COMPETITION UNDER THE LANHAM ACT

80.     Jackson realleges paragraphs 1 through 79 as though fully set forth herein.

81.     By engaging in the above conduct, First Trust intended to (i) force Jackson and Mellon to modify or abandon investment strategies that Jackson and Mellon offered to their

customers; (ii) force Jackson to replace Mellon with First Trust as an investment sub-adviser; (iii) damage the competitive reputations of Jackson and Mellon; (iv) divert existing and potential consumers from Jackson and Mellon to First Trust; (v) create confusion, mistake and deception among existing and potential customers of Jackson and Mellon; and (vi) otherwise cause competitive harm to Jackson and Mellon.

82. The above-described acts and false and misleading statements are material because they were intended to (and likely did) influence customers' decisions.

83. By engaging in the above conduct, First Trust acted willfully, in bad faith and with intent to deceive.

84. By reason of First Trust's unfair competition and bad faith conduct, including its false and misleading statements, Jackson has been (and will continue to be) immediately and irreparably harmed by the loss of its competitive advantage, reputation, and sales and business opportunities unless First Trust is enjoined by this Court.

85. Jackson has been damaged by First Trust's conduct and false representations in an amount to be proved at trial.

86. First Trust's above-described acts constitute false and misleading advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**COUNT V**
**COMMON LAW UNFAIR COMPETITION**

87. Jackson realleges paragraphs 1 through 86 as though fully set forth herein.

88.     The above-described bad faith conduct of First Trust constitutes unfair competitive acts and trade practices in Illinois and elsewhere.

89.     By reason of First Trust's bad faith conduct and unfair competition, Jackson has been (and will continue to be) immediately and irreparably harmed by the loss of its competitive advantage, reputation and sales and business opportunities unless First Trust is enjoined by this Court.

90.     Jackson has been damaged by First Trust's conduct in an amount to be proved at trial.

91.     First Trust's bad faith conduct and deceptive acts and practices are further and continuously damaging Jackson in a manner such that Jackson has no adequate remedy at law.

WHEREFORE, Jackson demands a jury trial and seeks appropriate relief as prayed for hereinafter.

## COUNT VI
## ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

92.     Jackson realleges paragraphs 1 through 91 as though fully set forth herein.

93.     The above-described bad faith conduct of First Trust constitutes deceptive trade practices in violation of 815 I.L.C.S. 510/1 *et seq.*

94.     First Trust's wrongful acts have caused, and unless restrained by this Court, will continue to cause, irreparable harm to Jackson's business and goodwill, for which Jackson has no adequate remedy at law.

WHEREFORE, Jackson demands a jury trial and seeks appropriate relief as prayed for hereinafter.

## PRAYER FOR RELIEF (COUNTS IV – VI)

95.     Counterplaintiff Jackson requests that this Court enter judgment in its favor and against counterdefendant First Trust, as follows:

A.     Preliminarily and permanently enjoining First Trust, its officers, agents, servants, employees, attorneys and all persons in active concert or participation with them from (i) filing any complaints against Jackson making baseless allegations of patent infringement, or (ii) making any false and misleading statements about its patents, about Jackson's alleged infringement of said patents, or about any litigation involving its patents;

B.     Damages in an amount to be determined at trial;

C.     Punitive damages in an amount to be determined at trial;

D.     An order requiring payment by First Trust of Jackson's attorneys fees and costs incurred herein; and

E.     Such other and further relief as the Court shall deem just and proper.

### JURY DEMAND

Jackson hereby demands trial by jury of all issues in this action triable of right by a jury.

33

Dated:  November 26, 2008        Respectfully submitted,


By:  */s/ James R. Ferguson*_____
     James R. Ferguson
     Andrea C. Hutchison
     MAYER BROWN LLP
     71 South Wacker Drive
     Chicago, Illinois 60606
     (312) 782-0600

     Attorneys for Jackson National Life Insurance Company, Jackson National Life Insurance Company of New York, Jackson National Life Distributors, LLC, JNL Variable Fund, LLC, Jackson National Asset Management, LLC, and JNL Investors Series Trust

34

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on November 26, 2008, a true and correct copy of the foregoing **JACKSON'S AMENDED ANSWER AND COUNTERCLAIM** was served by United States Mail, first class postage prepaid on:

> Stephen F. Sherry
> McAndrews, Held & Malloy
> 500 West Madison St.
> 34th Floor
> Chicago, IL  60661

and via electronic mail to:

> Stephen F. Sherry
> ssherry@mhmlaw.com
>
> and
>
> Sara J. Bartos
> sbartos@mhmlaw.com

> By:  */s/ James R. Ferguson*_____
> James R. Ferguson
> Andrea C. Hutchison
>
> Attorneys for Jackson National Life Insurance Company, Jackson National Life Insurance Company of New York, Jackson National Life Distributors, LLC, JNL Variable Fund, LLC, Jackson National Asset Management, LLC, and JNL Investors Series Trust